The District Court's decision in this case threatens the vitality of the Commodity Exchange Act to address the very type of market manipulation it was designed to curb. I'd like to focus my remarks on the two key errors underpinning the District Court's decision. One, the conclusion that ERCOT exemptions immunize the defendant-generator's GDF from liability under the Act. And two, the conclusion that the operator exemption, the final order as we've called it, extinguishes the private right of action under the CEA. Neither the final order nor ERCOT's small fish rule eliminate a claim of manipulation for the derivative financial markets. The involving or closely tied to the physical delivery of electricity. It is not intended and does not immunize the illegitimate use of those transactions to manipulate the purely financial markets that are tied to ERCOT prices. We've presented the Court with dozens of cases illustrating that just because an action or trading practice standing alone is lawful, whether by common law or statute or regulatory fiat, that does not mean that practice is immunized from anti-manipulation regimes. Legitimate transactions or trading practices pursued with an intent to manipulate is commodities manipulation. Intentionally losing money on anomalous transactions that fix a price to benefit the value of related positions that are tied to that price is market manipulation. The fact that the energy transactions themselves may be outside of the CEA because they're relieved of some of the regulatory duties that are applicable to other market participants or products does not matter. A transaction does not have to be governed by the CEA to be a trigger that is subject to an anti-manipulation claim. For example, the LIBOR reporting activities that we've mentioned in our briefs and again in the 28J letter to the Court that we recently filed are not subject to the CEA, but manipulation of commodity-based products that are tied to the LIBOR, the targets are subject to the AG. The regulator can clarify the uncertainty about the reach itself if it would like to do so. I beg your pardon, sir? The regulator could clarify the reach and the role of the Commodities Future Trading Commission Act if it elected to do so, couldn't it? I mean, we're here arguing about uncertainty about the act doesn't apply except for exceptions and this is not enumerated, the act is not enumerated in the exceptions, so it's not here. The place where that really best ought to be resolved is at the regulator. If they didn't intend that, it's kind of hard to, why should we do something different? And we completely agree, Your Honor. There is no reason for this Court to ignore the agency's view of its own prior order. I would call the Court's attention to the final order itself at 78 Fed Reg 19903. It contemplates that these transactions that are otherwise exempted could be used to manipulate markets and that that would remain actionable. It didn't go back and look again at its basic final order that it issued. I mean, we call the final order the order that basically exercised the power Congress gave to it to, the act to create these exemptions, the regulator to create these exemptions. And on the faceless, they exempted the act. Well, Your Honor, first of all, the act itself says that, and again, both of these are at 19903 in the final order itself, that the Commission understands that these transactions that are otherwise exempted, to the extent that they can be used in combination with other actions, will still be abusive of the act and will be actionable. I would quote from that section, the Commission says, if the exempted transactions are ever used, quote, in combination with trading activity in a DCM, that's a designated contract market like the DCM. So certainly the agency intended for this to continue to capture manipulation of derivative markets. And it certainly did not intend to extinguish the private right of action to do so. First, again, the final order pertains only to the limited energy transactions at ERCOT. It does not pertain to the illegitimate use of those transactions to manipulate another market. So that argument's an interpretive argument. You're not saying that the final order itself was ultra-virus because extending provisions to private rights of actions is not limited to the requirement exemption? I believe that's correct, Your Honor, because the final order does not unambiguously preclude a private right of action. It doesn't address that. The exemption cannot literally mean that it eliminates all but the enumerated provisions that are in the final order. Many of those provisions are registration or reporting requirements that were clearly the subject of the exemption. But others are part of the infrastructure of the Act without which the carved-out provisions make no sense and they can be enforced. But did you make that argument below? We relied heavily, Your Honor, on the agency's own interpretation of the Act, as we think the Court is entitled to do. Well, but how does that get around the sort of the moral logic, the reasoning that you have to find ambiguity in the plain language? You can't find the ambiguity because of an interpretive. Well, and I think the ambiguity is there, and we obviously briefed that to the Court in response to the argument that there was none. As I say, Section 1 contains all of the definitional boundaries. Section 3, which is 7 U.S.C. 5, contains all of the fundamental funding and purposes. Sections 12, 16, 19, they contain the Commission's operations and authority to implement the Act and further its purposes. There's also several references in the final order that say that the carved-out provisions specifically relating to anti-manipulation are not exclusive, that anything that pertains to the enforcement of the anti-manipulation is going to be carved out. There's also a section that, again, this is at 19903, where the Commission recognizes the need to reconstruct prices that would have existed but for the manipulation of the defendant, and specifically says that this is necessary for private litigants to measure their damages. We know what the agency was thinking through the excerpt that we've included in the bench exhibit at tab 2, that it was exempting the operators from certain duties otherwise required from the Act or regulations. It was not exempting them from enforcement by private litigants. And to Your Honor's point, the agency has told us it did not intend to eliminate the private right of action, and it does not believe that the final order does so. As the opposing counsel points out, the agency really hasn't told us that. They have proposed an interpretation of that sort, and it's not final. Well, Your Honor, all of the reasons that GDF and the amici have given for this Court to ignore the agency's view of its own order are really not that. But it's not the agency's view, is it? I mean, it's not final. It's a proposal. I mean, is that inconsequential in agency law, that it's just a proposal? It does not matter that the Southwest Power Pool proposed order that contains this statement is not final. The agency is interpreting its own prior order through official statement. This Court has given deference to far less formal agency interpretations. And the SPP exemption is not a If they would have persuasive value, that would be the measure. And the argument comes out that the statement was it would be unusual for them to exempt the private enforcement. I see nothing unusual at all about an agency not engaging supplementary private enforcement. Private enforcement is sometimes supplemental means of enforcing the standard, and sometimes it isn't. I just don't find anything persuasive about it. Well, Your Honor, the agency also said that if it had intended to eliminate such an important right, that it would have said so. And, for example, in footnote 18 of the I didn't say it. I beg your pardon? I don't know. It said so in about as plain an English as you can write. I mean, I don't Well, we would argue that it does not, that the carved-out exemptions are prohibitions. They are duties that were going to be or obligations to not engage in activity that were going to be carved out. To me, the difficulty, and I share my views about this with you, so you can reply to them, but what it did was to exempt the entire act. I mean, just quite a way. And then it provided that, I mean, any exceptions. So you're in the second step of trying to find some exception to that. That's the difficulty, the added difficulty of this. Well, we would agree that the final order is perhaps not a model of clarity, but there are ambiguities. The agency has told you what it thinks about it. You know, of importance, the SPP exemption is not a wholly unrelated proceeding, that the agency is just sort of reaching across and commenting randomly on this. SPP is an RTO ISO, exactly like the RTO ISO is in the final order. It was not included in the final order because it did not implement its market-based system until 2014, after the final order was issued. Let me push you to the filed rate doctrine. What about that? Your Honor, the filed rate doctrine does not preclude these claims. Aspire's claims are not based on payment of an approved rate for electricity, and we don't ask the Court to infringe on PEC's rate-setting function. Just like the plaintiffs and the dairy farmers, this is a claim brought alleging harm for manipulation of regulatory rates as a means of illegally establishing an artificial price for derivative commodities and contracts. Our opponent has argued to the Court that we are still complaining about the too-high rate, and that the filed rate doctrine bars that. But think about that this scheme could have been deployed in reverse. GDF could have suppressed prices in ERCOT to capitalize on a short position in the forward market. So it is not a complaint about the filed rate. It is a complaint about the manipulation of the expectations in the markets, and that's exactly what other courts have said, does not fall under the filed rate doctrine. If there were ambiguity, and if our deference or some deference does allow us to look at the subsequent interpretation, could you, for me, simplify what the manipulation is? Are you able to say it as, this is the false information, and to whom? In other words, the to whom is the cross-market theory, correct? Whereas the false information being injected is the company taking a loss deliberately by falsely indicating what the value will be the next day? Is that a fair characterization of what you say? That's very fair, Your Honor, and exactly so. So by making false statements of what its intended generation at certain prices were to the day-ahead market, and then not living up to that and taking, in some cases, enormous losses to benefit its positions in the forward markets, that is injecting false information. The LIBOR 4 decision that we've included in the courts, to the court of the 28J letter, it deals with exactly that, that by reporting false rates and tranches that the panel banks were going to borrow, they injected false information in the market, and that in itself was a lie. But your damage theory would require you to recalculate a hypothetical LMP, and that LMP is a great set. So I'm not sure how you so easily dance away from, I don't mean that in a derogatory way, move away from the reach of the file rate doctrine. It's an odd case, factually, and I don't think I've ever seen the file rate doctrine appearing quite that way. But it is a troubling problem for you. The agency recognizes, and again, at 19903, in the final order, that there will be a necessity to go back and reconstruct what the price would have been, the artificial price would have been, but for the defendant's illegitimate conduct in calculating it. That necessarily implicates what the LMP would have been at that time, but there's no way that one could ever enforce, either the agency or a private litigate could enforce this without establishing what the damage is. And the fact that it relates to those LMPs does not equate to paying a file rate. All right, counsel. Thank you. Ma'am? Ma'am? Ms. Vance? Just one more. I think it was the Texas amicus brief that said that CFTC would still have authority to pursue restitution for your client under the existing scheme. Did you have a response to that? If your theory of manipulation and fraud exists, they absolutely have authority to address that? The commission technically has the authority to address that, but that doesn't mean that the private right of action should be extinguished. Obviously, the agency and Congress realized that these were difficult types of manipulation, less obvious manipulation that needed all of the firepower that could be brought to bear, and there is no one better positioned than market participants who are sophisticated and intelligent in these markets to ferret out these types of manipulation that Dodd-Frank was intended to address. May it please the Court. The plain language of the CFTC's April 2013 final order is crystal clear in exempting ERCOT transactions from all provisions of the CEA, accepting only the CFTC's anti-fraud and anti-manipulation authority, and that means the final order unambiguously avoids the result that plaintiffs see here of allowing juries and courts to second guess and substitute their own judgment for the regulatory choices made by the expert market regulators. I would like to address three points regarding the narrow issue before this Court. First, the final order's unambiguous text exempts CEA section 22, which is the provision. Second, the CFTC's recent proposed order changes nothing in this appeal, and then third, the final order squarely applies to the transactions alleged here and therefore means that this lawsuit cannot go forward. And I'll start with the plain text of the final order because the district court was exactly right that that is the beginning and the ending of this case. As Your Honors have pointed out, the provision clearly says all include section 22, and section 22 is not then listed as one of the exceptions to that exemptions. I would submit that this, in fact, is the model of clarity. The final order is very precise and very particular about what it was going to exempt and what it was going to allow to leave. And in fact, in the proposed order that led to the final order, the CFTC even said in a footnote, and that's at 77 Federal Register 52-163 at note 372, that it was listing out the statutory provisions that are accepted to, quote, avoid ambiguity about what is left. So the district court interpreted that provision exactly right, and that should be the beginning and the ending of this appeal. Now plaintiffs have made the argument for the first time in a reply brief regarding the word requirements in section CEA section 4C-6. As Judge Higginson pointed out, that is not really an argument interpreting the final order. That is instead a collateral attack on the authority of the CFTC to have issued the final order. So it's waived not only because it's raised for the first time on appeal in a reply brief, but because it's attempting to challenge a final order from 2003, which is an improper collateral attack. But I would also just address it on the merits. The word requirements, as plaintiffs acknowledge, means something that makes somebody act or refrain from acting. But easily a private cause of action provision enforcing the fraud prohibitions, you know, compels behavior, it compels people to act or refrain from acting. And in fact, that's been plaintiffs' entire point all along, is that they think that the private action provision is necessary precisely because it compels behavior by market participants. And plaintiffs also . . . Counsel, to me, the strongest argument in your favor is simply that your client is simply shorting the market. And as I put a classic term, using derivatives to do that. And that is a sophisticated way in which, and it seems to me, with this Court I'll be very reluctant to get itself involved and leave this, or not to leave this to the regulator to adjust this market if indeed . . . And I've really been saying this because when I hear some reply down the road to it, why isn't this, it strikes me as a regulatory matter. My general point being that that conduct is not necessarily, it may not be regulable, but it also can be very disruptive to the market. Well, Your Honor is exactly right that this is a regulatory matter. The CFTC made a regulatory choice to exempt conduct, to exempt transactions that are covered by the final order from the liability under the CEA. And in turn, the local market regulators, the PUCT and ERCOT, have made regulatory choices about how to structure their market, what participants in that market are allowed to do, and in this case, as the allegations state, those market regulators allow exactly the kind of conduct that's allowed here. The PUCT gave the voluntary mitigation plan that authorized and, in fact, incentivized entities that are small fish to do exactly what's being attacked here. And so I completely agree that this case and this lawsuit is really just a collateral attack on the market, on market regulators. I mean, it's really not a complaint against our client. It's a complaint against the market in trying to change the way the market works. The plaintiffs have tried in other ways to change the way the market works by directly appealing to the PUCT, and those challenges were not successful. But that's exactly what this now is, is a collateral attack. And if I could make one more point about the word requirements, plaintiffs cite in their brief the preemption cases from the United States Supreme Court, Chippolone, Medtronic v. Lohr, there's plenty of others. The Supreme Court has expressly held in the context of not only positive enactments, but also private rights of action. And this Court has also held the same, that a private right of action enforcing duties compels behavior every bit as much as positive enactments. So we don't think that argument has any merit even beyond the fact that it's waived. Before you get off the requirements issue, if you put aside that, is the limiting principle to all provisions being overbroad, that it then defines it as transactions only? No, all provisions has to mean all provisions. And the transactions, I think, provision is different. I view that as a different requirement. In other words, the exemption is as to all provisions. And so that tells you what CEA provisions they're allowed to invoke. Then the next question is whether the final order What about procedural provisions that aren't enumerated, but therefore wouldn't be swept into exemption from all procedural aspects? Well, and plaintiffs have not, I've not heard them identify an actual provision that the CFTC would need in place. Because the CFTC went and had a laundry list of provisions. And for example, CEA section 4C4, which sets forth the, excuse me, 64, which sets forth the enforcement authority of the CFTC, that contains jurisdiction provisions. That contains remedies. That contains all sorts of things. Now, that said, if there were, say, a definitions provision that's out there that was not picked up, and I've not seen one that is, but if that's the case, I think there is a vast difference between something like a definitions provision that gives meaning to a term in a substantive provision and a private right of action, which is fundamentally different, expanding the scope of liability. And importantly, the private right of action provision is far more analogous to the provision which gives the CFTC enforcement authority to enforce the prohibitions on fraud. And so the fact that the CFTC went and explicitly exempted those from liability but did not do the same thing for the private action provision, which is far more analogous, I think is extremely meaningful. And so that's the answer as to provisions that they might not have picked up, which again, I haven't seen any. Now as to the CFTC's proposed order in the SPP matter, we've set forth a number of arguments in the brief why this court does not need to give controlling weight to that. But the final order is unambiguous. This court, as it knows, only defers to an agency on interpretation of their own provisions when the order is ambiguous. And here there is nothing ambiguous about the final order, which says all provisions are exempted and then comes back and says these are the only ones. The CFTC in the final order was very precise and the court should hold the CFTC to that. But now, you know, you rely on apaltry, but that's more of a statutory Chevron context as distinct from allowing more informal interpretive material. And in their reply, they cite belt and why wouldn't our and much more informal documents be informative if we saw ambiguity? Well, and I think the fact that it's unambiguous means this court doesn't need to worry about whether it's proposed, whether it's final. So I think the fact that it's unambiguous, the court doesn't need to look at belt, doesn't need to address that issue. But if we did perceive ambiguity, why would belt not be the more controlling thing? It would not because that case dealt with, you know, interpretive letters and handbooks. They were actually the agency's official word. What we have here is a proposed order. It's a draft. It's not them saying here is our final order. It's them saying, it's the CFTC saying, this is what we're proposing to do, but we would really like comments. Now comments have come in. Most of the comments were negative, and the agency has not taken any further action. And so I think in that context, all you have is a draft. You don't even have an amicus brief that the CFTC, you know, used its authority to go and file and make a final decision on, hey, this is our official view. So that's why I think belt doesn't help plaintiffs and I think a case like, you know, Appletree, which says, look, if it's a proposed rule, we don't look at it. But again, I think the clearest path for this court is just to recognize that the final order is unambiguous in what it exempts and go from there. I'd like to now turn to the third point, which is that the final order squarely applies to the transactions that are alleged here. You know, the final order spells out the criteria, and the only issue that plaintiffs have addressed about why it might not cover it is their argument that it only covers completed contracts, that it can't cover, you know, unconsummated bids. And, of course, this was an argument not presented to the district court, but on appeal we've addressed it and pointed out that that argument is directly contrary to this court's decision in Radley, which interpreted the same phrase, agreements, contracts, or transactions, and held that that includes more than just consummated contracts. It also includes unconsummated bids, unconsummated offers, withholding of supply. That's the holding in Radley, and this squarely defeats the argument here that only consummated contracts can be covered. That's the right result, and as Radley pointed out, for a number of reasons, but one of them is if the court were to limit the exemption to only consummated contracts, it would read the word transactions out of the list of items, and it would also make the exemption meaningless, because this exemption cannot turn on the fortuity of whether a particular bid clears the market, or else no party will have any certainty whatsoever and will not know in advance whether it's going to have the exemption. So it would really defeat the whole point of the exemption to narrowly constrain this clause to only cover consummated contracts. Now, the argument first put in the reply brief is that the word executed changes everything, because it's execution of contracts, agreements, or transactions. But in Radley, the clause that was being interpreted actually said transactions, and then kind of move forward in the text, entered into, which is equivalent to the execution of contracts, agreements, or transactions. And the court in Radley also, for guidance in interpreting transactions, looked to another CEA provision, which is 7 U.S.C. 2A1A, which defines the exclusive jurisdiction of the CFTC, expressly defines transactions to include bids and offers. That statutory provision actually covers transactions, you know, dot, dot, dot, traded or executed. So that provision also used that. And I think just the normal meaning of the word execution, you know, is defined by the dictionary, Black's Law dictionary, as the, you know, carrying out, or the act of carrying out. And it makes perfect sense to say that the CFTC, in the final order, exempted the carrying out of a bid, or the carrying out of an offer. If you're forced to put aside what the district relied on, and this exemption, and the Congressional desire to give Texas more autonomy for its structure, so you just have to address the fraud theory itself, I think the sort of the most poignant statement in the record that you challenge is, did we move the market forward? If you align that hearsay statement with the reliance they focus on in the LIBOR case, do you see at least manipulation there? Well, and of course, that statement that, that, that Your Honor cited, dealing with move the market, was, it was in the complaint by a confidential witness. And we've cited our brief cases showing that you cannot, at the pleading stage, rely on that. But If the statement exists, the president of the company is saying, did we move the market forward, doesn't that align with the theory of manipulation that's stated in particularly the LIBOR case? We don't quarrel with the very basic principle that lawful activity in one market, if done with the requisite intent to manipulate prices in another market, can state a liability under the CEA in the absence of the exemption. But the whole point of the exemption is to, is to exempt the CEA. Even up to Texas to enforce it if they want. Well, and I'm glad Your Honor raised that, because in the final order, we're pointing out that the CFTC recognized the possibility of cross-market impact. And that was 78 Federal Register 19903. What, what the CFTC said there was, yes, it, it's possible that lawful and exempted conduct could impact other markets. And their answer to that was, but we are regulating and we can identify that. In addition, the local market regulators will be enforcing their rules. They can ferret out irregular trading behavior in that market that might suggest, you know, some, some manipulation. For example, and this was in the proposed order that led to the final order, they pointed out that a party repeatedly taking a loss in the primary local market is irregular trading activity that might indicate something's going on. They can do that with or without the small fish rule? Yes, I think that's, that's correct. I mean, the small fish rule allows certain parties to go and, and bid to the cap. If you don't have the small fish rule, there might be other exceptions that would allow you to bid over marginal cost. But that, but, but certainly a local market regulator would be able to identify that kind of behavior. The other thing the CFTC said in the final order in discussing cross-market impact is that the local market regulators are going to be required to feed data and information to the CFTC to help the CFTC in using its enforcement authority to identify cross-market impact. So in other words, the final order recognized the potential for, you know, local market actions to impact other markets. And its answer was that the CFTC can find that along with the help of the local market regulators. And that really underscores the whole point of the exemption, which is the CFTC decided that there is enough regulation in place by the local market regulators, including the PUCT and ERCOT and the market monitors and, and those amicus briefs obviously set forth a lot of the regulatory efforts that they, that they use. And then the CFTC, which has ample authority to go and identify any misconduct and bring enforcement actions. And so the notion that we are operating now in the Wild West because of this exemption or the notion that this threatens the vitality of commodities markets really just ignores what the CFTC said in the final order. And the whole point of why Congress allowed it to grant exemptions and why it specifically granted exemption, which is that there is plenty of regulation in place. PUCT and ERCOT and the other RSO, ISOs, RTOs filing the amicus briefs should disprove the notion that the, that the markets are akin to the Wild West. And Your Honor, I just want to address one point about restitution. Judge Higginson, you asked about that. The CFTC does have the ability to award restitution and that was in a statutory provision that was expressly accepted from the exemption. And as the PUCT pointed out in their amicus brief, they likewise have the ability to award restitution. So there's extensive regulation in place, even in the absence of the private right of action. And there are specific mechanisms for third parties to get restitution. We've also briefed several alternative arguments for affirming the district court's judgment and I'm happy to submit those on the briefs unless the court has any questions. We would ask this court to affirm the judgment of dismissal. Thank you. I'd like to briefly address four points that were raised by my opposing counsel first, just to get out of the way. We understand that the court may apply Radley to include all of the activities, not just the consummated activities in the, in the ERCOT physical market. But Congress's intent to provide some stability with transactions and instruments and products that are traded in the physical markets that are operated by the RTO, ISOs has absolutely no bearing on the use of these same transactions and instruments and products to manipulate prices on a different market. So with or without the application of Radley, our position is still correct. To speak to your point, Judge Hagenstein, it absolutely matters that what the agency is interpreting in the proposed order is its own order. The, the premise of that type of deference to interpretive statements from an agency is largely grounded on authorship. This court applied that in Veld. This court discussed that again in Exelon. That is the heart of, of that doctrine. And there is absolutely no reason why this court should ignore the agency's view, which is in a published statement, of its own order. There is certainly not expanded liability, as Mr. Oldham pointed out in his statement, indicated. There's not any due process or, or fair notice problem. The purpose of prohibiting tinkering with a prior order, applying retroactivity, is to ensure that actors can conform their conduct to the law. But this is not a change by the agency. This conduct, this alleged conduct, was always actionable under the Act and under, and under the final order. It's always been prohibited. GDF does not have any protectable or defensible right in having fair notice that there could be more people around to catch it. So that, that really is, is a hollow argument. A reliance interest argument. A reliance interest, which is what underpins that prohibition of allowing an agency to go back and sort of rejigger its own rules. So it absolutely does make a difference that it is its own order. It absolutely does make a difference that this is not a substantive change. It is not an expansion of liability. This conduct was always prohibited. It still is. The idea that there will still be many, many layers of regulation in place that we shouldn't worry is wrong. Under the district court's order and its interpretation, the final order shields all or caught conduct from claims of derivative market manipulation, whether by an agency or by a private litigant, despite the order's express retention of the anti-manipulation provisions. And extinguishing the private right of action only is absolutely counter to the policy arguments, which we'll The Dodd-Frank amendments recognized that the swindlers were the cleverest folks in the room. They recognized that there needed to be increased breadth. The private right of action was implied in the act long before it was included in the act for that exact reason, that there was a recognition that the best positioned folks to enforce this were the market participants who understood the market. They could see these things going on. I'd like to briefly address the statement that Your Honor raised from the CEO, did we move the markets? There's a lot of scrambling to say, well, that doesn't count because it came from a confidential informant's hearsay, but that's not all there is. It's not even the most compelling thing there is. We have shown the lower court, we've presented to the court here today, the charts that are at tab one, where you can see the anomalous spikes in the market from GDF's activity in ERCOT. I'm here on a 1286 motion, Your Honor. Precisely so. We have raised enough to show that there was an intention, there was ability, there was motive to do that. We have included in our complaint to the court, and this is Exhibit 1, I believe it's at 443 in the record, that GDF had done this before. This was not a novel idea. There is plenty to show that something hinky was going on. The Second Circuit has recognized, the LIBOR court in four recognized, that when you're talking about market manipulation, many of the facts are going to be in the hands of the defendant. We should not require pleading with absolute specificity. Thank you. You have thoroughly briefed the rest of what you were not able to cover. We appreciate both sides helping us with this case.